**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
|     Plaintiff, | |
| | CRIMINAL ACTION |
| v. | NO. 1:16-cr-00067-SCJ-CMS |
| TYSON RHAME,<br>TERRENCE KELLER, aka TERRYK,<br>JAMES SHAW, and FRANK BELL, | |
|     Defendants. | |

<u>DEFENDANTS RHAME, SHAW, AND BELL'S MOTION TO DISMISS
INDICTMENT AND SUPPORTING MEMORANDUM OF LAW</u>

Defendants Tyson Rhame, James Shaw, and Frank Bell (hereinafter "the Sterling Defendants"), respectfully move, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), to dismiss the Indictment as against the Sterling Defendants for failure to allege an offense. In support of this Motion, the Sterling Defendants submit the Memorandum of Law included below.

## I. <u>Introduction and Factual Background</u>

Sterling Currency Group, LLC ("Sterling") sold Iraqi dinars and other foreign currencies from 2004 until June 3, 2015, when its assets were seized by the government and it ceased operations. Indictment, ¶¶ 2, 3. Sterling was owned by

Defendants Tyson Rhame and James Shaw; Defendant Frank Bell became the Chief Operating Officer in 2011. Indictment, ¶ 3.

Even before 2004 when Sterling formed, there was a demand in the United States for the Iraqi dinar. Many people purchased dinars – from Sterling and from other businesses similar to Sterling, (Indictment, 8), – as an investment based on the possibility of a "revaluation," or "RV", that would increase its value exponentially, and there were numerous publicly available sources, including Defendant Keller and the GET Team's sites, in which people discussed the possibility or likelihood of an RV. Indictment, ¶ 6.[1]

It is entirely legal to buy and sell Iraqi dinar, and the government does not allege that Sterling's sales or purchases of Iraqi dinar were themselves unlawful. *See* Indictment, ¶¶ 2, 4. Furthermore, and importantly, the government specifically concedes in the indictment that the Sterling Defendants made "no direct representations about the likelihood of an 'RV' themselves or offer[ed] investment advice to potential investors." Indictment, ¶ 13, *see also ¶* 15. Instead, the government alleges that the Sterling Defendants vicariously engaged in a conspiracy and scheme to defraud based on *Defendant Keller's* allegedly false statements that the RV was imminent. The government infers the existence of a

---

[1] The facts included herein are for purposes of this Motion only and not intended as admissions in the trial on the merits or for any other purpose.

conspiracy and joint scheme to defraud *based on the fact that Sterling advertised its legal services on Defendant Keller's website, forums and conference calls Defendant Keller hosted.* Indictment, ¶ 8. Beyond this circumstance – which is undisputed – the government's allegations of a conspiracy and concerted action rest on nothing more than carefully crafted speculation, and fail on their face to present the essential elements of the offenses charged. To be clear, the Indictment does not allege that Sterling or any Sterling Defendant had an ownership or other type of interest in The GET Team. Nor does the Indictment allege that Sterling or any Sterling Defendant had any control or dominion over Keller or over The GET Team. While the government wants the Court to believe otherwise, Sterling and The GET Team were separate, independent businesses. Even assuming the facts in the Indictment are true, the only reasonable conclusion about the relationship between Sterling and The GET Team to be reached from those facts is that the they were separate, independent entities.

Other than in the charging language, the indictment fails even to allege that the defendants "agreed" or "entered into an agreement" to accomplish an alleged unlawful objective – the essential element of a conspiracy. Instead, the government claims that the Sterling Defendants and Defendant Keller had a "secret arrangement . . . to promote and 'pump' the Iraqi dinar in exchange for payments

3

made by Sterling to benefit Keller."  Indictment, ¶ 10.  The only "arrangement" between the Sterling Defendants and Defendant Keller was that Sterling paid to advertise its services "through a web banner placed on The GET Team's website," and a Sterling representative appeared briefly "on conference calls with followers." Indictment, ¶ 8.  Beyond these limited facts, the government implicates the Sterling Defendants in a conspiracy and scheme to defraud based on speculation and unsupported assumptions.  Thus, the indictment speculates, rather than alleges, (1) that there was a "correlation between Sterling's increased sales and [Keller's] promotion and 'pump' of the Iraqi dinar," which was "cemented" by the presence of a Sterling representative on the conference calls and internet forums, Indictment ¶ 12; (2) that the "presence and participation" of the Sterling representatives on the conference calls "provided further validation" that "claims about an imminent RV. . . should be believed," Indictment ¶ 13; and (3) that the Sterling Defendants "never believed that Keller or the other dinar promoters had the types of high-level sources they repeatedly claimed to have." Indictment, ¶ 14.

Thus, even though the government *twice* concedes in the indictment that Sterling did not promote the dinar as an investment, Indictment, ¶¶ 13, 15, the government has charged the Sterling Defendants with conspiracy and fraud on nothing more than the fact that they advertised their legal sale of a legal product

through Keller's forums. The indictment does not mention the length of Defendant Keller's conference calls (often, several hours) or that Sterling representatives left the calls after briefly explaining the services offered by Sterling – even though the government is aware of both facts.

The allegations describing the financial arrangement between Keller and Sterling are similarly deceptive, as even a close reading of the indictment attests. In one paragraph, the government alleges that, "since at least as early as August 2011, Sterling paid Keller over $160,000." Indictment, ¶ 11. Earlier in the indictment, however, the government acknowledges that Sterling *advertised* through Keller's websites, etc. Indictment, ¶ 8. As the government is surely aware, the $160,000 essentially is a reasonable and proportional advertising cost of four thousand dollars a month over a period of four years (i.e., August 2011 through June 2015). This exchange (i.e., money in exchange for advertising), which the government acknowledges existed, is nothing more than a routine business arrangement replicated millions of times a year, if not more. It does not support a criminal indictment. Further, the government recognizes that, in addition to Defendant Keller, there are other promoters of the dinar and of the RV theory, and not all promoters are associated with Sterling. Indictment, ¶¶ 6-7. The government also acknowledges that Defendant Keller received advertising fees of

5

over $100,000 from at least one other dinar dealer, showing that there was a legitimate market for advertising with The GET Team. Indictment, ¶ 11. Since Sterling merely advertised through Defendant Keller's websites, the government's characterization of this business relationship as a "secret arrangement" is both misleading and disingenuous. To the contrary, the relationship between Sterling and Defendant Keller was patent – anyone could see the banner ad or hear Keller's conference calls. While the public did not know the amount Sterling paid The GET Team, roughly $4,000.00 a month is not at all suggestive of Sterling paying Keller's company for anything more than this simple advertising. In other words, no facts in the indictment, even if assumed to be true for purposes of this Motion, support the government's allegation of a "secret arrangement."

Although Sterling did not offer investment advice, did not tout the RV, and made no false statements, the government has drafted the Sterling Defendants into a conspiracy with Keller, and sought to charge them with fraud based only on Keller's allegedly false statements that the RV was imminent, or that he had inside sources who had told him it was imminent. Vicarious liability is not a basis for criminal culpability. Because the indictment utterly fails on its face to establish a conspiracy or, indeed, any evidence of concerted action, the charges against the

Sterling Defendants, all of which are based on the alleged acts of Keller, must be dismissed as insufficient on their face.

## II.    Argument and Citation of Authority

"For an indictment to be valid, it must contain the elements of the offense intended to be charged, and sufficiently apprise the defendant of what he must be prepared to meet." *United States v. Bobo*, 344 F.3d 1076, 1083 (11th Cir. 2003); *see also United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006). "Furthermore, if the indictment tracks the language of the statute, it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Bobo,* 344 F.3d at 1083. "An indictment is sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense." *United States v. Steele*, 178 F.3d 1230, 1233-34 (11th Cir. 1999).  In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and, more specifically, the language used to charge the crimes. *See United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992).

8827526

The essence of any conspiracy prosecution is the existence of an agreement to achieve an illegal objective. *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003).[2] Therefore, the government must establish that the Sterling Defendants knew of, and participated in the alleged scheme to defraud, which, as alleged, was entirely based on the allegedly fraudulent representations by Keller. *See United States v. Brenson*, 104 F.3d 1267 (11th Cir. 1997); *United States v. Willett*, 751 F.3d 335 (5th Cir. 2014); *United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014). Mail and wire fraud consist of: "(1) an intentional participation in a scheme to defraud a person of money or property, and (2) the use of the mails or interstate wires in furtherance of the scheme." *United States v. Schmitz*, 634 F.3d 1247, 1260 (11th Cir. 2011); *see also Pasquantino v. United States*, 544 U.S. 349, 355 (2005) ("we have construed identical language in the wire and mail fraud statutes *in pari materia*").

In this case, not only does the government attempt to hold the Sterling Defendants criminally culpable based on a theory of vicarious liability, but *there is no allegation that Keller's alleged false statements played any role in Sterling's business.* More pertinently, however, there is no basis even for assuming that the

---

[2] *See also United States v. Cruse*, 805 F.3d 795, 811 (7th Cir. 2015) ("Conspiracy has two elements: (1) an agreement to commit an unlawful act; and (2) the defendant must have knowingly and intentionally joined that agreement.").

purportedly false statements made by Defendant Keller on The GET Team calls or The GET Team website were made with the intent to defraud dinar buyers, or, indeed, were anything more than obvious rumors, speculation, or puffing.

### A. There is No Legal Basis for the Government's Theory of Vicarious Conspiratorial Liability.

Sterling's business was selling and buying-back dinars and other foreign currencies. So, The GET Team, which brought together people who were interested in currency speculation and the dinar as an investment, was a logical forum for Sterling to advertise its services. There is nothing wrong with selling dinars, and nothing wrong with advertising where customers are likely to be found.

In this case, however, the government alleges that, by paying to advertise on The GET Team website, Sterling became liable for Keller's alleged false statements of The GET Team. This is not a case in which an illegal enterprise marketed its product through an affiliated program or website, concealed the affiliated relationship with the program or website, and profited from false statements by its affiliated promoter. *Compare United States v. Bidwell*, 3:07-cr-02016 (S.D. Cal. December 2008) (finding a conspiracy with an affiliate to steer business towards an illegal online pharmaceutical company because everybody involved in the venture did so to profit from the illegal practices of the promoter); *United States v. Wheat*, 1:06-cr-382 (N.D.Ga. 2006) (defendant sold controlled

9

substances after targeting customers through supposedly independent marketing sites, but the sites were not "independent" in any way).  In the *Bidwell* case, the alleged "affiliate websites" received money based on every drug prescription written.  *United States v. Bidwell*, 3:07-cr-2016, Doc 409, page 4 (S.D. Cal. 2008).  In this case, the GET Team received no benefit from Sterling or any Sterling Defendant for any sale of dinar by Sterling , whether the purchaser was a follower of The GET Team, a reader of The GET Team website, or a listener to The GET Team conference calls.

Nor do the allegations in the Indictment mirror cases involving illegal false advertising by disguised endorsers who appear to be impartial, but are actually paid by the seller.  In such cases, the public is led to believe that the endorser believes in the value or healing powers of the product when, in fact, the endorser is simply paid to make such false claims.  16 C.F.R. §§ 255.1, 255.5 (FTC regulations governing false advertising through the use of endorsers).[3]  In this case, there was no effort to hide the fact that Sterling was a dinar seller and advertiser on Keller's platform – just like the other dinar seller and other companies that advertised

---

[3] *See, e.g.*, *Ramson v. Layne*, 668 F. Supp. 1162, 1167-1169 (N.D. Ill. 1987); *Aramowicz v. Bridges (In re Diamond Mortg. Corp.)*, 118 B.R. 588, 594-595 (Bankr. N.D. Ill. 1989).

through Keller – and there is no allegation that Sterling directed The GET Team on what to say.

Finally, this case bears no resemblance to the cases in which telemarketers who are supposedly unaffiliated with the supplier of a product or service, knowingly make false statements about the product.[4]  In such cases, the courts find that the product's seller knowingly engaged the telemarketers with explicit instructions about the content of the telemarketing calls.  *See, e.g.*, *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1006 (N.D. Cal. 2010); *FTC v. Lifewatch Inc.*, 2016 U.S. Dist. LEXIS 45057 (N.D. Ill. Mar. 31, 2016).

There are no cases, such as the one the government is attempting to bring here, in which a company sold a legitimate product at a legitimate price to a willing buyer and has been charged with conspiracy to defraud based on the fact that the company advertised with a separate entity (i.e., The GET Team), that independently chose to make  exaggerated – or even false – claims about the value of that product.  In fact, the government admits that others on the internet, also with no relation to Sterling, touted the dinar and the RV theory.  Indictment, ¶¶ 6,

---

[4] Here, the false statements – if any – were made by an entity that was not encouraged to do so by Sterling, or paid to do so, or given the content of the false advertising.  If Sterling's payment to The GET Team for the display of its banner advertisement deserves condemnation, this is a matter best left to civil enforcement and the FTC, not this novel theory of vicarious criminal culpability.

7.  That Sterling was a beneficiary of news, rumors, opinions, and speculation is not a crime.

### B. Keller and The GET Team Did Not Make Any Materially False Statements.

The allegedly false statements asserted in the Indictment are not material. A "false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999). In fact, the only "false" statement the government alleges is Keller's purported claim that he had "high-level confidential sources," who, presumably, supported his prediction that the RV would happen. Indictment, ¶ 7. An unnamed, "confidential source" is clearly off-the-record, not based on identifiable, reliable sources, and cannot be considered anything more than a rumor. *See Potter v. U.S.*, 362 F.2d 493, 498 (5th Cir. 1966) ("It is self evident that none can know the reliability of an unknown source, and reliability is the controlling factor."). The statements by Keller within The GET Team platform, therefore, offered nothing more than rumors, opinions, and predictions.

Predictions are, by their very nature, not true or false, but just a particular species of opinion. Nothing other than a false statement of material fact can form

the basis for a fraud prosecution. *United States v. Farinella*, 558 F.3d 695 (7th Cir. 2009) (defendant replaced the labels on food products that said "best when purchased by" with a new date; this was not fraud, because "best when purchased by" is not a statement of fact that is either true or false).

Thus, regardless of whether Keller had the high-level sources he allegedly claimed, the claim was more likely designed to enhance his importance, than to deceive people into buying dinars from Sterling.

> "[P]uffing" or "sellers' talk" is not a crime under federal fraud statutes . . . (statements that a company is "nationally known" and that the product is "among the finest . . . in the world" are not cognizable under the federal mail fraud statute). Instead, fraud requires proof of a "material misrepresentation, or the omission or concealment of a material fact *calculated to deceive another out of money or property*."

*United States v. Rodriguez*, 732 F.3d 1299, 1303 (11th Cir. 2013)

Keller's listeners would not have been influenced to purchase *from Sterling* simply because Keller claimed to have spoken with high-level sources. Indeed, as noted in the indictment, Keller's website was one of a number of websites (many of which had no affiliation with Sterling) that touted the benefits of buying the dinar. Indictment, ¶¶ 6, 7. Misleading statements made during a negotiation to convince the other party to believe a position cannot be considered material misrepresentations and are not criminally fraudulent. *United States v. Weimert*, 2016 U.S. App. LEXIS 6461, 13-15 (7th Cir. Apr. 8, 2016) ("Deception about

13

negotiating positions – about reserve prices and other terms and their relative importance – should not be considered material for purposes of mail and wire fraud statutes.").

As the Eighth Circuit has noted, many shrewd advertising promotions are designed to persuade consumers to make purchases, but do not amount to fraud.

> [I]n today's society, criminal prosecution cannot be used to punish those who run promotional schemes to make money simply because some persons are more susceptible to try their luck than a more prudent recipient of the mail. If purchase by the naive and imprudent consumer be the test to prosecute promoters, most state and charitable lotteries, as well as promotions using 900 numbers to solicit "lonely hearts," could be criminally liable.

*United States v. Goodman*, 984 F.2d 235, 240 (8th Cir. 1993). Thus, even if the Sterling Defendants were responsible for Keller's claims, which they are not, Keller's claims are no more actionable than the claims at issue in *Goodman*.

## C. There was no Agreement Between the Sterling Defendants and Keller to Make Materially False of Statements.

Despite the "secret arrangement" language in the Indictment, the government has not alleged any evidence - profit sharing, commissions, bonuses, or rewards - to support the notion that Keller was incentivized to drive business to Sterling.

With respect to the Sterling Defendants, all the government has alleged is that Sterling paid to advertise with The GET Team, and made truthful statements

14

8827526

on The GET Team calls. So, even if *Keller* was engaged in some form of criminal conduct, there is no basis for a criminal conspiracy prosecution. Absent proof that there were the necessary two it takes to tango, there is no conspiracy. *United States v. Parker,* 839 F.2d 1473, 1482 (11th Cir. 1988); *United States v. Johnson,* 440 F.3d 1286 (11th Cir. 2006) (reversing money laundering conspiracy conviction where evidence failed to show that the other person was aware that funds were tainted, and therefore could not have conspired with defendant). Moreover, even if more than one person engaged in criminal conduct, unless the conspirators are knowingly engaged in a single conspiratorial objective – with knowledge of the other conspirators' role – there is no conspiracy. *United States v. Chandler*, 388 F.3d 796 (11th Cir. 2004) (the McDonald's Monopoly conspiracy convictions of all defendants were reversed based on government's failure to prove that the participants who benefitted from the fraudulent conduct were aware of the other participants' illegal behavior); *Morrison v. California*, 291 U.S. 82 (1934) (absence of proof that one conspirator shared in the objectives of the alleged conspiracy dooms the conspiracy conviction).

8827526

**D. There were no Intended Victims that Defendant Keller, The GET Team, or the Sterling Defendants Intended to Deceive Out of Property or Money.**

The government has not alleged, nor is there any evidence to show, that anyone listening to the conference calls was victimized by the alleged fraudulent conduct or, even, that anyone intended to victimize any listener. The government's basis for the alleged criminal conspiracy to defraud is that the Sterling Defendants advertised on The GET Team, which was owned by Keller, who made false statements, but the indictment fails to identify a single victim, who ever listened to The GET Team or ever saw or heard Sterling's advertisement of its services through The GET Team. Indictment, ¶¶ 18, 20. While a criminal fraud scheme need not succeed in its object to qualify as an offense under the statutes, there still must be prospective purchasers who are the intended victims. *See United States v. Novak*, 443 F.3d 150 (2d Cir. 2006) (government must identify intended victims of fraud scheme). Also, the government must prove that the defendants intended to harm the victims through the fraudulent conduct. *United States v. Gabriel*, 125 F.3d 89 (2d Cir. 1997); *United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998) (defendant must intend some harm or loss to the victim). This hurdle is hard enough when considering a case against Keller; it is insurmountable in any case against the Sterling Defendants.

8827526

Furthermore, the government also acknowledges that Keller had relationships with other advertisers who paid to appear on The GET Team calls as well, and that, throughout the alleged conspiracy, others besides Keller promoted the dinar as a potential investment. Indictment, ¶¶ 6, 11 When other market participants are behaving in a certain manner, acting in conformity with them demonstrates good faith and an honest belief that there is nothing improper with that conduct. *United States v. Litvak*, 808 F.3d 160, 189-190 (2d Cir. 2015) (trial court erred in excluding evidence offered by the defendant that his supervisors permitted the aggressive sales practice by other brokers, which demonstrated his honest belief that he was not engaged in improper or illegal conduct).

Defendants Rhame and Bell advertised and appeared in good faith, along with other industry representatives, on some of The GET Team's conference calls. Unless the statements they made were materially false or fraudulent, they cannot give rise to their criminal liability. And, as the government admits, the Sterling Defendants made "no direct representations about the likelihood of an 'RV' themselves or offer[ed] investment advice to potential investors . . . ." Indictment, ¶ 13. Defendants Rhame and Bell's professional appearances on The GET Team calls, along with other market participants, demonstrate their good faith, honest

belief that they were not engaging in improper or illegal conduct by advertising with The GET Team.

### E. Profiting from Another's Misconduct does not Equate to Conspiracy.

Even were it assumed for purposes of this Motion that the Sterling Defendants were aware of the alleged comments by Keller, they still are not criminally liable because mere knowledge that a crime is being committed does not make one a conspirator, even where the person with knowledge benefits from a crime committed by another. *United States v. Lluesma*, 45 F.3d 408 (11th Cir. 1995) (government must prove that defendant had knowledge of the conspiracy's objectives; conduct that aids the conspiracy that occurs absent the defendant's knowledge that his conduct has an illegal object, does not support a conspiracy conviction).[5]

---

[5] *See also United States v. Hernandez*, 141 F.3d 1042 (11th Cir. 1998); *United States v. Thomas*, 8 F.3d 1552 (11th Cir. 1993); *United States v. Parker*, 839 F.2d 1473 (11th Cir. 1988); *United States v. Brown*, 459 F.3d 509 (5th Cir. 2006) (one defendant was not shown to have been knowledgeable of the fraud perpetrated by the others); *United States v. Dobson*, 419 F.3d 231 (3rd Cir. 2005) (government must prove that company employee participated in the fraud scheme perpetrated by her employee, not some other fraudulent conduct); *United States v. Pearlstein*, 576 F.2d 531 (3rd Cir. 1978); *United States v. Loder*, 23 F.3d 586 (1st Cir. 1994) (defendant was not shown to have knowledge of his employee's scheme to defraud insurance company, even though defendant was aware that he was engaged in nefarious activity of some sort); *United States v. Hanson*, 41 F.3d 580 (10th Cir. 1994) (owner of company was not aware of fraud perpetrated by employee, thus precluding owner's conviction for fraud); *United States v. Ragan*, 24 F.3d 657 (5th

In *United States v. Falcone,* 311 U.S. 205 (1940), the Supreme Court held that a supplier of sugar and yeast could <u>not</u> be prosecuted for being a member of an illegal liquor conspiracy, even if there was evidence the seller knew it was likely the buyer would use the products for an illicit purpose. *Id.* at 207.[6] Thus, even if Keller or The GET Team were committing some crime, it does not follow that because Sterling paid to advertise with them, the Sterling Defendants are guilty of a criminal offense.

Compare Sterling and *Falcone* to *United States v. Frink,* 912 F.2d 1413 (11th Cir. 1990), where the Eleventh Circuit addressed the issue of a "supplier's culpability." The *Frink* defendant sold automobiles to a drug smuggler, providing the smuggler with false registration information and false odometer statements, and

---

Cir. 1994) (the defendant was a manager of a brokerage house that engaged in fraudulent activities, but he was never shown to have initiated or perpetrated the activities alleged in the indictment to be fraudulent); *United States v. Goyal*, 629 F.3d 912 (9th Cir. 2010) (government failed to prove that defendant was engaged in knowing an willful deception); *United States v. Sarro*, 742 F.2d 1286 (11th Cir. 1984); *United States v. Hayes*, 574 F.3d 460 (8th Cir. 2009); *United States v. Rufai*, 732 F.3d 1175 (10th Cir. 2013).

[6] In *Direct Sales Co. v. United States,* 319 U.S. 703 (1943), however, the Court upheld the conviction of a defendant who supplied abnormal quantities of morphine to a rural doctor. While the Court distinguished the case from *Falcone* on the ground that morphine was a restricted drug, it reinforced the point the *Direct Sales* court emphasized that mere proof that the supplier knows that his product is being put to an illegal use is not itself enough to sustain a conspiracy prosecution. *Id.* at 711-712.

accepting structured cash payments to avoid CTR reporting requirements. The Eleventh Circuit affirmed the conviction of the automobile-selling defendant. While the sale of cars (like the sale of sugar in *Falcone*) involves a legal product, the *Frink* defendant's sales methods and the false documentation marked him as a member of the drug conspiracy. *Id*. at 1417. *See also United States v. Morse,* 851 F.2d 1317 (11th Cir. 1988) (sale of "smuggling-equipped" airplane to twenty-three-year-old marijuana smuggler, at twice the market value, with all payments being made in cash, and no proper documentation, supported drug conspiracy conviction of seller).

A supplier of ordinary materials or services can only be convicted of conspiracy if he knows of the unlawful purpose for the purchase or of the ends to which the goods and services will be put, ***and intends to further the illegal ends*** of the purchasers. *United States v. Superior Growers Supply Co.*, 982 F.2d 173, 177 (6th Cir. 1992) (trial court properly dismissed an indictment which charged the defendant supply company with conspiring to supply materials to marijuana growers). There must be intent to join and facilitate the conspiracy, not simply knowledge of the purpose of the conspiracy, even if the defendant somehow profits from the existence of the conspiracy.

In an opinion by Judge Easterbrook, and joined by Judge Posner, the Seventh Circuit considered a case in which a trailer park landlord rented a trailer to a known methamphetamine manufacturer:

> When writing for the court of appeals in *Falcone,* Learned Hand concluded that a supplier joins a venture only if his fortunes rise or fall with the venture's, so that he gains by its success. Judge Hand offered a similar definition of aiding and abetting in *United States v. Peoni,* 100 F.2d 401 (2d Cir.1938), and we adopted his approach in *United States v. Pino-Perez,* 870 F.2d 1230, 1235 (7th Cir.1989) (en banc). On this view the sale of a staple commodity such as sugar or telephone service does not enlist the seller in the criminal venture; in a competitive market the vendor could sell to someone else at the market price, and the buyer could turn to other sources. Anonymous transactions are the norm in markets and do not create criminal liability; when the seller has knowledge but the terms remain the same, there is no reason to infer participation in the enterprise . . .

*United States v. Blankenship*, 970 F.2d 283, 285-287 (7th Cir. 1992) (repeat citations removed).

These cases flow from the bedrock principle that it is not a crime to know that another person is committing a crime, and this is true even if the person may benefit from the criminal behavior of the other person. *See also United States v. Cessa*, 785 F.3d 165, 179 (5th Cir. 2015) ("merely providing services to a known drug dealer and accepting the proceeds of the illegal activity as payment is insufficient as a matter of law to establish criminal liability for money laundering.

8827526

There must be some additional circumstantial evidence of intent to further the illegal conspiracy.").

If, as the government contends, The GET Team was intent on defrauding its members, listeners or readers, it does not automatically follow that the Sterling Defendants are guilty of fraud simply because Sterling had an agreement and paid to advertise on The GET Team's website and conference calls.

**F. The Money Laundering Counts Fail with the Fraud Counts.**

Counts twelve through twenty-four of the Indictment for conspiracy to commit money laundering and money laundering rely on the criminality of the conduct charged in counts two through eleven. Essential to a charge of money laundering is the receipt of property derived from a specified unlawful activity. *United States v. Wetherald*, 636 F.3d 1315, 1325 (11th Cir. 2011). However, because the "specified unlawful activity" claimed in this case, mail fraud and wire fraud, Indictment, ¶¶ 22, 24, fails for the reasons stated above, counts twelve through twenty-four of the indictment, alleging conspiracy to commit money laundering and money laundering, must be dismissed as well.

8827526

## Conclusion

For the foregoing reasons, the Sterling Defendants respectfully request that the Court dismiss the indictment against them.

Dated: June 6, 2016.

ARNALL GOLDEN GREGORY LLP

*/s/ Aaron M. Danzig*
Aaron M. Danzig
Ga. Bar No.2015151
Sean T. Sullivan
Ga. Bar No. 558105
171 17th St., NW
Suite 2100
Atlanta, Georgia 30363-1031
Phone: (404) 873-8504
Fax: (404) 873-8505
aaron.danzig@agg.com
sean.sullivan@agg.com
Counsel for Defendant Frank Bell

ALSTON & BIRD, LLP

*/s/ Michael Brown*
Michael Brown
Ga. Bar No.088875
Meredith Kingsley
Ga. Bar No. 793726
Ankith Kamaraju
Ga. Bar No. 667989
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Phone: (404) 881-7000
Fax: (404) 881-7777

8827526

mike.brown@alston.com
meredith.kingsley@alston.com
ankith.kamaraju@alston.com
Counsel for Defendant Tyson Rhame

GARLAND, SAMUEL & LOEB, P.C.

*/s/ Donald F. Samuel*
Donald F. Samuel
Ga. Bar No. 624475
3151 Maple Drive, N.E.
Atlanta, Georgia 30305
Phone: (404) 262-2225
Fax: (404) 365-5041
dfs@gsllaw.com
Counsel for Defendant James Shaw

## LOCAL RULE 7.1(D) CERTIFICATION

I certify that the foregoing has been formatted in Time New Roman, 14-point font type, which complies with the font size and requirements of Local Rule 5.1(B).

Dated: June 6, 2016.

*/s/ Aaron M. Danzig*
Aaron M. Danzig

8827526

## CERTIFICATE OF SERVICE

I certify that I have electronically filed the forgoing document with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

Dated: June 6, 2016.

*/s/ Aaron M. Danzig*
Aaron M. Danzig